**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson, *pro hac vice*
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

JOSE ORTIZ and LAURA WILLIS ALBRIGO, individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

DECKERS OUTDOOR CORP.,

Defendant.

CASE NO. 3:25-cv-09631-RFL

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**

JURY TRIAL DEMANDED

## TABLE OF CONTENTS


INTRODUCTION .......... 1

THE PARTIES .......... 3

JURISDICTION AND VENUE .......... 3

SUBSTANTIVE ALLEGATIONS .......... 4

A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies. .......... 4

B. Defendant Falsely Informed Users That They Could Disable or Reject the Websites' Use of Cookies. .......... 9

C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites. .......... 23

1. The Websites Cause the Interception of the Contents of Communications. .......... 23

2. Facebook Cookies (All the Websites). .......... 26

3. Google Cookies (All the Websites). .......... 37

4. Microsoft Bing Cookies (Hoka, Teva, Ugg, and Koolaburra Websites). .......... 49

5. Snapchat Cookies (All the Websites). .......... 51

6. Tealium Cookies (All the Websites). .......... 62

D. The Third Parties Intercept User Communications While in Transit. .......... 75

E. The Signaling and Addressing Information Intercepted by the Third Parties. .......... 77

F. The Private Communications Collected are Valuable. .......... 79

PLAINTIFFS' EXPERIENCES .......... 80

CLASS ALLEGATIONS .......... 87

CAUSES OF ACTION .......... 89

First Cause of Action: Invasion of Privacy .......... 89

Second Cause of Action: Intrusion Upon Seclusion .......... 92

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) .......... 94

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) .......... 97

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............ 99

Sixth Cause of Action: Unjust Enrichment.......................................................... 102

PRAYER FOR RELIEF ............................................................................................ 104

Plaintiffs Jose Ortiz and Laura Willis Albrigo ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Deckers Outdoor Corp. ("Defendant" or "Deckers"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce websites (including, www.hoka.com, the "Hoka Website"; www.teva.com, the "Teva Website"; www.sanuk.com, the "Sanuk Website"; www.ugg.com, the "Ugg Website"; and www.koolaburra.com, the "Koolaburra Website[1]; referred to collectively as the "Websites"), Defendant displays to them a popup cookie consent banner, which is identical on each of the Websites. Defendant's cookie banner discloses that the Websites use cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that rather than accepting cookies, they can choose to "Manage Preferences" on the Websites by clicking or selecting the link to do so, as shown in the following exemplar screenshot from the Hoka Website (which has been closely cropped and enlarged to enhance readability):




2. Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that

[1] According to a message posted on the Koolaburra Website, this Website has closed as of March 31, 2025. For the Koolaburra Website only, Plaintiffs' claims and allegations in this Class Action Complaint should be construed to pertain to the period in which it was active which, on Plaintiffs' information and belief, was at least four years prior to the filing of this Complaint until March 31, 2025.

users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to disable or reject all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information, Defendant nonetheless caused multiple third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick, Google Analytics, and YouTube), Microsoft Corporation (Microsoft Bing), Snap Inc. (SnapChat), and Tealium, Inc. (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Websites.

4. Contrary to users' express rejection of cookies and tracking technologies on the Websites, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs' and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding the Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Websites' visitors who adjusted all available toggle buttons or settings on the Websites' "Storage Preferences" window sought to avoid. Defendant falsely told the Websites' users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving

clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

7. Plaintiff Jose Ortiz is, and was at all relevant times, an individual and resident of Daly City, California. Plaintiff Ortiz intends to remain in California and makes his permanent home there.

8. Plaintiff Laura Willis Albrigo is, and was at all relevant times, an individual and resident of San Diego, California. Plaintiff Willis Albrigo intends to remain in California and makes her permanent home there.

9. Defendant Deckers Outdoor Corporation is a Delaware corporation with its headquarters and principal place of business in Goleta, California.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

11. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie Based Tracking Technologies.

15. Every website, including each of the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on any of the Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website's server to identify the origin of the request and return the response.

16. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

17. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Class members to access the Websites were located in California.

18. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Websites' programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Websites is done so pursuant to agreements between Defendant and those Third Parties.

19. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

20. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

21. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; google.com; bat.bing.com; tr.snapchat.com, etc.). When the user's browser loads a webpage (such as a webpage of the Websites) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

22. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect the Websites' users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Websites;

- **Website Interactions:** Data on which links, buttons, or ads on the Websites that a user clicks;
- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with the Websites' content;
- **Interests and Preferences**: Insights into user interests based on the types of content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Websites' products viewed or added to shopping carts;
- **Device Information**: Details about the Websites' users' device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Websites;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on any of the Websites during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website's user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Websites' users' IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

23. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase

preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

24. Defendant specializes in designing and distributing footwear under several brand names, including Hoka, Teva, Sanuk, Ugg, and Koolaburra. Defendant owns and operates the Websites for each of these brands, which allow visitors to receive information about its footwear products and purchase such products. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), the Websites' users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

25. Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit any of the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Websites, or that Defendant causes to be loaded. Because Defendant controls the software code, and is capable of determining whether a user is accessing the Websites from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

26. Defendant explained the third-party cookies it used on the Websites as follows in its Cookies Policy:

> WHAT ARE COOKIES?
>
> Cookies (or similar tracking technologies designed for mobile devices) are simple text files stored on your computer or mobile device when you visit certain web pages. A cookie records basic information about your visit, such as your user

settings or what pages you have viewed. The Site (and potentially other websites) can then recognize this information in the future and can use it to improve your overall experience, for example, by remembering your log-in details, preferences or even recommending certain content.

We set both first-party cookies and third-party cookies. First-party cookies are placed on your device directly by our Site. Third-party cookies are placed on your device by our selected partners and service providers. We use third-party cookies to, for example, measure user numbers on the Site and to deliver adverts that are relevant to the content you are interested in.

There are four principle types of cookies, which perform different functions. The main types are:

1 *Essential Cookies*
These cookies are necessary for the Site to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these cookies, but some parts of the site will not then work. We use and store these cookies for the duration of your visit on the Site.

2 *Analytics Cookies*
These cookies collect information about how a website is used in order to improve the website's effectiveness. They track information such as, which parts of the website have been visited, what links have been clicked and if any errors have occurred. Analytics cookies are commonly used to ensure that popular content is displayed more prominently on a website so that users can find the information that they are looking for more quickly. We use and store these cookies for up to fourteen (14) months.

*3* *Personalization Cookies*
These cookies are used to deliver specific features or functions on a website and measure how you access and use the Site, so that we may improve performance. The most common use of personalization cookies is to remember preference settings or to store log-in details in order to personalize your visit. For example, personalization cookies are used to save you the trouble of inputting your username every time you access the Site. We use and store these cookies for up to fourteen (14) months.

*4* *Targeted Advertising and Social Media Cookies*
Targeted Advertising and social media cookies may be placed by us, or by our advertisers, to store information about the webpages that you have viewed. This allows us and our advertisers to deliver adverts that are relevant to the content you are interested in. These adverts may be displayed on the Site or on other sites that you visit. Social media cookies are also used to operate ‘Like’ or ‘Share’ buttons, which users can click to let other people know that they have found a particular webpage useful or entertaining. Other sites (normally social networking sites) will then recognize these cookies and display your shared content to other users. Targeted Advertising and social media cookies are capable of tracking your browser

> across other sites and building up a profile of your interests. We use and store these cookies up to fourteen (14) months.
>
> ...
>
> **What About Third-Party Advertisers and Tracking?**
>
> We use third parties, such as network advertisers and social media platforms, to assist us in advertising, including displaying our advertisements on other websites and through social media platforms; we also may use network advertisers and other third parties to assist us in identifying relevant advertising on our Sites. Network advertisers are third parties that display advertisements based on your visits to our Site as well as other websites. This enables us and these third parties to target advertisements by displaying ads for products and services in which you are likely to be interested. Third party ad network providers, advertisers, sponsors and/or traffic measurement services may use cookies, JavaScript, tracking pixels, web beacons (including clear GIFs), Flash LSOs and other technologies to measure the effectiveness of their ads and to personalize advertising content to you. We may provide these third-party advertisers with information about your usage of our Site and our Services, which may include pages viewed, products purchased, your device IP address, browser type, email addresses (where hashed or otherwise rendered pseudonymous) and other user and device level pseudonymous information, as well as aggregate or non-personally identifiable information about visitors to our Site and users of our Services.
>
> We may also use platforms provided by companies such as Meta and Twitter to offer you interest-based ads. These platforms allow us to personalize the ads that we display to you through their services. We may use a tracking pixel to do so. We may also convert your email address into a unique value which can be matched by our partner company with a user on their platform to allow us to serve you interest-based advertising to those matched users…[2]

### B. Defendant Falsely Informed Users That They Could Reject the Websites' Use of Cookies.

27. When Plaintiffs and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner, which was identical on each of the Websites. As shown in the screenshot below, the cookie consent banner stated, "This website utilizes technologies such as cookies to enable essential site functionality, as well as for analytics, personalization, and targeted advertising purposes." The banner then purported to provide users the opportunity to "Manage Preferences" as shown in the following screenshot from the Hoka Website, which has been closely cropped and stretched for readability:

[2] Deckers Brands Cookies Policy (updated 1/18/2024) (available at https://www.deckers.com/cookies-policy) (the "Cookies Policy"). Based on information and belief, this version was in effect at the time of Plaintiffs' rejections of cookies on the Websites.




28. When Plaintiffs and other users of the Websites clicked or selected the "Manage Preferences" link, they were then presented with Defendant's "Storage Preferences" window. There, Defendant further represented that users "have the option of disabling certain types of cookies," including all categories of Targeted Advertising, Personalization, and Analytics cookies (except the "Essential" cookies, which Defendant represented as "[r]equired to enable basic website functionality" that users "may not disable"). In addition, Defendant further represented that users could opt out of the sale and sharing of their personal information by adjusting the toggle buttons or settings to do so, then clicking or selecting the "Save" button. All of this is as shown in the following exemplar screenshots from the Hoka Website:






29. Plaintiffs and other Websites' users who adjusted the available toggle buttons or settings to disable or reject all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of personal information, thereby indicating their choice and/or agreement to decline or reject all non-essential cookies and tracking technologies in use on the Websites, could then continue to browse the Websites after clicking or selecting the "Save" button, as the popup cookie consent banner and Storage Preferences window disappeared.

30. Defendant's popup cookie consent banner and Storage Preferences window led Plaintiffs, and all those users of the Websites similarly situated, to believe that they disabled or rejected all cookies and tracking technologies, especially those used to "deliver advertising that is more relevant to you and your interests" and those used to sell or share personal information. The banner and Storage Preferences window further reasonably led Plaintiffs and those Websites' users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon adjusting the available settings on the Storage Preferences window to disable or reject all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information.

31. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Websites users adjusted the available settings or toggle buttons on the Storage Preferences window, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites.

32. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on the Websites' users' browsers and devices and/or transmitted to the Third Parties which enabled the Third Parties to collect user data in real time that discloses the Websites' visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by disabling or rejecting cookies, Defendant failed to prevent cookies from being transmitted to the Third Parties, enabling them to track user behavior and communications.

33. Some aspects of the operations of the Third-Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing network transmissions. The following screenshots, obtained using one such tool, show examples of Third-Party cookies being transmitted from a Websites' user's device and browser to Third Parties even after the user adjusted all available toggle buttons or settings to disable or reject all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

a. The Hoka Website:






| Name | Domain | Cookies |
|---|---|---|
| activity;register_conversion=1;src=8112555;npa=0;a..._US%2FCo... | ad.doubleclick.net | 3 |
| activity;src=8112555;npa=0;auiddc=1834927556.17171..._US%2F... | ad.doubleclick.net | 3 |
| activity;register_conversion=1;src=8112555;type=ho..._US%2FCo... | ad.doubleclick.net | 3 |
| activityi;fledge=1;src=8112555;type=hokac0;cat=hok...%2Fwww.... | td.doubleclick.net | 3 |
| 877699579?random=1717175214919&cv=11&fst=171717521...... | td.doubleclick.net | 3 |
| 877699579?random=1717175214948&cv=11&fst=171717521...... | td.doubleclick.net | 3 |
| 877699579?random=1717175452011&cv=11&fst=171717545...a... | td.doubleclick.net | 3 |
| activityi;src=8112555;type=hokac0;cat=hoka-00-;ord...%2Fwww.... | 8112555.fls.doubleclic... | 3 |
| activityi;dc_pre=CP7ZplexulYDFWvm_QUdsoQHYw;src=81...%2F... | 8112555.fls.doubleclic... | 3 |
| dc_pre=CI725pewulYDFQrh_QUd2E0MZA;src=8112555;type..._U... | adservice.google.com | 2 |
| dc_pre=CLfeplexulYDFUjn_QUd4SwDyg;src=8112555;type...%2F... | adservice.google.com | 2 |
| dc_pre=CP7ZplexulYDFWvm_QUdsoQHYw;src=8112555;type...%... | adservice.google.com | 2 |
| 877699579?gtm=45be45t0v9175036776za200&gcd=13l3l3l...=&... | google.com | 2 |
| 877699579?gtm=45be45t0v9175036776za200&gcd=13l3l3l...=&... | google.com | 2 |
| api_dynamic.js | cdn.dynamicyield.com | 2 |
| api_dynamic.js | cdn.dynamicyield.com | 2 |
| collect?v=2&tid=G-Q8S2ZQDGSP&gtm=45je45t0v89458631...re... | analytics.google.com | 2 |
| ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j101&...jid=... | www.google.com | 2 |
| 877699579?gtm=45be45t0v9175036776za200&gcd=13l3l3l...=&... | google.com | 2 |
| 877699579?gtm=45be45t0v9175036776za200&gcd=13l3l3l...=&... | google.com | 2 |
| api_dynamic.js | cdn.dynamicyield.com | 2 |
| ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j101&...jid=... | www.google.com | 2 |
| 018fcf9d5029000366a00ccfd68b0506f001506700bd0?call...=utag... | visitor-service-us-west... | 1 |
| i.gif | collect.tealiumiq.com | 1 |
| collect?v=1&_v=j101&a=797730995&t=pageview&_s=1&dl...e&... | www.google-analytics.... | 1 |
| p | tr.snapchat.com | 1 |
| collect | www.google-analytics.... | 1 |
| collect?v=1&_v=j101&a=2022269812&t=pageview&_s=1&d...T... | www.google-analytics.... | 1 |
| 018fcf9d5029000366a00ccfd68b0506f001506700bd0?call...=utag... | visitor-service-us-west... | 1 |
| application.js | cdn.truefitcorp.com | 1 |
| fitrec-responsive.css | cdn.truefitcorp.com | 1 |
| i.gif | collect.tealiumiq.com | 1 |
| i.gif | collect.tealiumiq.com | 1 |
| collect | www.google-analytics.... | 1 |
| ec.js | www.google-analytics.... | 1 |
| application.js | cdn.truefitcorp.com | 1 |
| collect?v=1&_v=j101&a=756043126&t=pageview&_s=1&dl...T& | www.google-analytics | 1 |

b. The Teva Website:



c. The Sanuk Website:




| Name | Domain | Cookies |
|---|---|---|
| trigger/?id=197730767247654&ev=SubscribedButtonCli...7171... | www.facebook.com | 6 |
| tr/?id=197730767247654&ev=SubscribedButtonClick&dl...1717... | www.facebook.com | 6 |
| 877700300?random=1717176434525&cv=11&fst=171717643...... | td.doubleclick.net | 3 |
| activityi;src=8112555;type=gener0;cat=produ0;ord=7...ps%3A... | 8112555.fls.doubleclic... | 3 |
| activityi;dc_pre=COfF-aq0uIYDFRDI_QUd1Wglfg;src=81...ps%3A... | 8112555.fls.doubleclic... | 3 |
| 877700300?random=1717176330805&cv=11&fst=171717633...... | td.doubleclick.net | 3 |
| activityi;fledge=1;src=8112555;type=gener0;cat=pro...ps%3A%... | td.doubleclick.net | 3 |
| activityi;fledge=1;src=8112555;type=gener0;cat=pro...ef=https... | td.doubleclick.net | 3 |
| 877700300?random=1717176323691&cv=11&fst=171717632...... | td.doubleclick.net | 3 |
| activityi;src=8112555;type=gener0;cat=produ0;ord=5...=2;~ore... | 8112555.fls.doubleclic... | 3 |
| activityi;dc_pre=CITknNu0uIYDFfbi_QUdFgQOfA;src=81...=2;~o... | 8112555.fls.doubleclic... | 3 |
| 877700300?random=1717176434554&cv=11&fst=171717643...... | td.doubleclick.net | 3 |
| 877700300?random=1717176323664&cv=11&fst=171717632...... | td.doubleclick.net | 3 |
| 877700300?random=1717176330766&cv=11&fst=171717633...... | td.doubleclick.net | 3 |
| activityi;src=8112555;type=gener0;cat=produ0;ord=8...ef=https... | 8112555.fls.doubleclic... | 3 |
| activityi;dc_pre=CKDdrqa0uIYDFTjauAgd7SwB2A;src=81...ef=ht... | 8112555.fls.doubleclic... | 3 |
| 877700300?random=1717176428650&cv=11&fst=171717642...... | td.doubleclick.net | 3 |
| 877700300?random=1717176428624&cv=11&fst=171717642...... | td.doubleclick.net | 3 |
| 877700300?random=1717176333304&cv=11&fst=171717633...... | td.doubleclick.net | 3 |
| activity;register_conversion=1;src=8112555;type=ge...=2;~oref... | ad.doubleclick.net | 3 |
| activity;register_conversion=1;src=8112555;type=ge...;epver=2;... | ad.doubleclick.net | 3 |
| collect?t=dc&aip=1&_r=3&v=1&_v=j101&tid=UA-1239828...0... | stats.g.doubleclick.net | 3 |
| activity;register_conversion=1;src=8112555;type=ge...ps%3A%2... | ad.doubleclick.net | 3 |
| activity;register_conversion=1;src=8112555;type=ge...ef=https... | ad.doubleclick.net | 3 |
| activityi;src=8112555;type=gener0;cat=homep0;ord=1...;epver=... | 8112555.fls.doubleclic... | 3 |
| activityi;dc_pre=COeaydi0uIYDFUvg_QUdIA4Gxg;src=81...;epver... | 8112555.fls.doubleclic... | 3 |
| 877700300?random=1717176330805&cv=11&fst=171717633...... | td.doubleclick.net | 3 |
| activityi;fledge=1;src=8112555;type=gener0;cat=pro...=2;~oref... | td.doubleclick.net | 3 |
| activityi;fledge=1;src=8112555;type=gener0;cat=hom...;epver=... | td.doubleclick.net | 3 |
| 877700300?random=1717176333278&cv=11&fst=171717633...... | td.doubleclick.net | 3 |
| dc_pre=CKDdrqa0uIYDFTjauAgd7SwB2A;src=8112555;type...ef... | adservice.google.com | 2 |
| dc_pre=COeaydi0uIYDFUvg_QUdIA4Gxg;src=8112555;type...;ep... | adservice.google.com | 2 |
| collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...=... | analytics.google.com | 2 |
| st?sec=8774680&inHead=true&id=-5089067336693316896...2... | st.dynamicyield.com | 2 |
| api_dynamic.js | cdn.dynamicyield.com | 2 |
| collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...2... | analytics.google.com | 2 |


Elements
Console
Sources
Network
Performance
Memory
Application
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Hide extension URLs
All
Fetch/X
Big request rows
Overview
Name
Domain
Cookies
st?sec=8774680&inHead=true&id=-5089067336693316896...2... st.dynamicyield.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...2... analytics.google.com 2
ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j101&...&j... www.google.com 2
st?sec=8774680&inHead=true&id=-5089067336693316896...%... st.dynamicyield.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...cia... analytics.google.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...n... analytics.google.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...h_... analytics.google.com 2
st?sec=8774680&inHead=true&id=-5089067336693316896...p... st.dynamicyield.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...ex... analytics.google.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...n... analytics.google.com 2
2b3577e8f2ff9__next.png cdn.dynamicyield.com 2
29ef93db95e85__prev.png cdn.dynamicyield.com 2
st?sec=8774680&inHead=true&id=-5089067336693316896...2... st.dynamicyield.com 2
st?sec=8774680&inHead=true&id=-5089067336693316896...2... st.dynamicyield.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-3B8SBQJBP7&gtm=45je45t0v89459447...Sa... analytics.google.com 2
dc_pre=COfF-aq0ulYDFRDI_QUd1Wglfg;src=8112555;type...ps... adservice.google.com 2
dc_pre=CITknNu0ulYDFfbi_QUdFgQOfA;src=8112555;type...=2;... adservice.google.com 2
collect?v=1&_v=j101&a=1032070162&t=pageview&_s=1&d...... www.google-analytics... 1
i.gif collect.tealiumiq.com 1
collect?v=1&_v=j101&a=2055709290&t=pageview&_s=1&d...... www.google-analytics... 1
i.gif collect.tealiumiq.com 1
collect?v=1&_v=j101&a=730276167&t=pageview&_s=1&dl...7... www.google-analytics... 1
i.gif collect.tealiumiq.com 1
collect?v=1&_v=j101&a=1299023804&t=pageview&_s=1&d...... www.google-analytics... 1
i.gif collect.tealiumiq.com 1
i.gif collect.tealiumiq.com 1
p tr.snapchat.com 1
p tr.snapchat.com 1
tattle.api.osano.com tattle.api.osano.com 0
877700300?random=1717176330766&cv=11&fst=171717633..... td.doubleclick.net 0
captcha/?initialCid=AHrlqAAAAAMAMHBeMCzDtgMA9GAy%2... geo.captcha-delivery.... 0
877700300?random=1717176323664&cv=11&fst=171717632..... td.doubleclick.net 0
wpt.json cdn0.forter.com 0
390 / 767 requests
92.1 MB / 95.2 MB transferred
123 MB / 132 MB resources
Finish: 2.8 min

d. The Ugg Website:




Elements
Console
Sources
Network
Performance
Memory
Application
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Hide extension URLs
All
Fetch/
Big request rows
Overview
Name
Domain
Cookies
collect www.google-analytics... 1
mon lucil.ediemidnightzo... 1
collect?v=1&_v=j101&a=2028597159&t=pageview&_s=1&d...... www.google-analytics... 1
tc_imp.gif?e=37dfbd8ee84e00126be9c632ed4789949225c...a9... lucil.ediemidnightzo... 1
ct?id=6396&url=https%3A%2F%2Fwww.ugg.com%2Fmaster-...... lucil.ediemidnightzo... 1
018fcfb8b4c100603d6fa87d3a080506f001406700bd0?call...=ut... visitor-service-us-wes... 1
i.gif collect.tealiumiq.com 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
collect www.google-analytics... 1
collect?v=1&_v=j101&a=845413038&t=pageview&_s=1&dl...T... www.google-analytics... 1
tc_imp.gif?e=37dfbd8ee84e00126be9c632ec4e829f9225c...66b... lucil.ediemidnightzo... 1
ct?id=6396&url=https%3A%2F%2Fwww.ugg.com%2Fon%2Fde... lucil.ediemidnightzo... 1
018fcfb8b4c100603d6fa87d3a080506f001406700bd0?call...=ut... visitor-service-us-wes... 1
i.gif collect.tealiumiq.com 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
collect www.google-analytics... 1
ec.js www.google-analytics... 1
collect?v=1&_v=j101&a=1415964680&t=pageview&_s=1&d...... www.google-analytics... 1
mon lucil.ediemidnightzo... 1
mon lucil.ediemidnightzo... 1
tc_imp.gif?e=37dfbd8ee84e00126be9c632ec4e8d9f9225c...897... lucil.ediemidnightzo... 1
ct?id=6396&url=https%3A%2F%2Fwww.ugg.com%2Fgift-bo...a... lucil.ediemidnightzo... 1
018fcfb8b4c100603d6fa87d3a080506f001406700bd0?call...=ut... visitor-service-us-wes... 1
i.gif collect.tealiumiq.com 1
mon lucil.ediemidnightzo... 1
p tr.snapchat.com 1
p tr.snapchat.com 1
518 / 818 requests
3.8 MB / 5.5 MB transferred
25.4 MB / 40.3 MB resources
Finish: 1.1 min
DOI

e. The Koolaburra Website:




Elements Console Sources Network Performance Memory Application
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Hide extension URLs
All
Fetch
Big request rows
Overview
Name
Domain
Cookies
activity;register_conversion=1;src=8112555;npa=0;a...oref=htt... ad.doubleclick.net 3
activity;src=8112555;npa=0;auiddc=346807486.171717...oref=... ad.doubleclick.net 3
activity;register_conversion=1;src=8112555;type=ko...oref=htt... ad.doubleclick.net 3
activity;register_conversion=1;src=8112555;type=ko...oref=htt... ad.doubleclick.net 3
iframe_api www.youtube.com 3
activity;register_conversion=1;src=8112555;npa=0;a...en_US%... ad.doubleclick.net 3
activity;src=8112555;npa=0;auiddc=346807486.171717...en_U... ad.doubleclick.net 3
activity;register_conversion=1;src=8112555;type=ko...en_US%... ad.doubleclick.net 3
iframe_api www.youtube.com 3
activityi;fledge=1;src=8112555;type=koola00;cat=ko...en_US%... td.doubleclick.net 3
875342016?random=1717177432261&cv=11&fst=171717743... td.doubleclick.net 3
875342016?random=1717177408837&cv=11&fst=171717740... td.doubleclick.net 3
activityi;fledge=1;src=8112555;npa=0;auiddc=346807...en_US... td.doubleclick.net 3
activityi;fledge=1;src=8112555;type=koola00;cat=ko...-slide%... td.doubleclick.net 3
875342016?random=1717177408896&cv=11&fst=171717740... td.doubleclick.net 3
?mpid=d9ae1e07-5c0f-4406-86d8-6b79e5c64c1d&placeme...... placement-api.us.afte... 2
dc_pre=CNKSnLe4ulYDFRPi_QUdeloCcQ;src=8112555;type...e... adservice.google.com 2
dc_pre=CKzElte4ulYDFWbcuAgdoOkLdA;src=8112555;type...o... adservice.google.com 2
dc_pre=CPSqlte4ulYDFXD8_QUdQVUDiw;src=8112555;type...o... adservice.google.com 2
index.js placement-api.us.afte... 2
event iq.afterpay.com 2
event iq.afterpay.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
afterpay.js?merchant_key=bc060ef544e986c3e86ebb13b9b58... portal.afterpay.com 2
api_dynamic.js cdn.dynamicyield.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
ga-audiences?t=sr&aip=1&_r=4&slf_rd=1&v=1&_v=j101&...ji... www.google.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
api_dynamic.js cdn.dynamicyield.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
collect?v=2&tid=G-8ZTZDRKQGE&gtm=45je45t0v89457977...... analytics.google.com 2
458 / 783 requests
1.8 MB / 3.5 MB transferred
22.7 MB / 40.8 MB resources
Finish: 30.69 s
DO

34. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Websites at https://www.hoka.com, https://www.teva.com, https://www.sanuk.com, https://www.ugg.com, and https://www.koolaburra.com, respectively. The screenshots depict only network traffic occurring ***after*** the user disabled or rejected all non-essential cookies using the settings or toggle buttons available on the Storage Preferences window. As shown above, despite the user's choice to disable or reject all cookies, the user's interactions with the Websites resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com; google.com; bat.bing.com; tr.snapchat.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers disabled or rejected all cookies and tracking technologies (other than those "Essential" for the Websites to function) by adjusting the toggle buttons or settings on the Storage Preferences window to do so. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination or rejection of all cookies.

35. Plaintiffs' and other Websites' users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

36. As users interact with the Websites, even after adjusting all available settings or toggle buttons in the Storage Preferences window, thereby declining or rejecting the use of cookies and similar technologies for targeted advertising, personalization, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored

on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

37. The Third-Party code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on the Websites' users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites.[3]

### 1. The Websites Cause the Interception of the Contents of Communications.

38. The Websites include search bars and other input fields through which users enter information. For example, below are screenshots of the search bar currently available on the Hoka Website where users can type into the search box to cause the Website to search its contents.

[3] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected *after* the user had rejected all non-essential cookies using the Website in question.




39. All of the Websites include (or in the case of the Koolaburra Website, included) a similar search bar that allows users to input a search query and search the website.

40. When users input the information into the search bar field, they intend to communicate the contents of their searches directly to the Website.

41. Instead, Defendant programmed the Websites such that the contents of those communications are transmitted to, and intercepted by, the Third Parties while the communications are in transit between users' browsers and the Websites.

42. For example, the Hoka Website causes users' search queries to be transmitted to third parties, including Google, even after users have rejected all unnecessary cookies. When a user submits a search, the Hoka Websites loads a results page that includes the user's query in the URL. The Hoka Website then transmits that URL to third parties, thereby disclosing the full search query to those parties. In the example below, the test string "trail running" was sent to Google along with cookie data, the url of the page the user was viewing, and the user's detailed device and browser information:




43. The Websites also offer a feature that allows a user to search for where a product is sold. Below is an example of the search results of inputting "San Francisco, California" into the "Store Locator" search bar on the Hoka Website:



44. All of the Websites (with the exception of the Sanuk Website) offer the feature that allows users to search for where products are sold by allowing users to input data into the location search bar. On information and belief, the Website also causes information input by users on the location search that is intended to be sent to the Website to be intercepted in a similar fashion as search queries, as described above.

**2. Facebook Cookies (All the Websites).**

45. Defendant causes third-party cookies to be transmitted to and from the Websites' users' browsers and devices to and from the **facebook.com** domain, even after users elect to disable or reject all non-essential cookies (including all categories of Targeted Advertising, Personalization, and Analytics cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

46. The facebook.com cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Hoka Website cause the following data to be sent to Meta when the user clicks a button on the website:

[4] https://www.facebook.com/privacy/policies/cookies/.



GET
200
https://www.facebook.com/privacy_sandbox/pi
com%2F&rl=&if=false&ts=1717175180413&cd[but
C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%2
2%2C%22type%22%3Anull%7D&cd[buttonText]=Vis
20HUMAN%20FLY%E2%84%A2%22%7D&sw=1920&sh=1080&

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| id | 888963951216828 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fwww.hoka.com%2F |
| rl | |
| if | false |
| ts | 1717175180413 |
| cd[buttonFeatures] | %7B"classList"%3A"deckers-button__label"%2C"destination"%3A""%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"Visit%20Site"%2C"numChildButtons"%3A0%2C"tag"%3A"span"%2C"type"%3Anull%7D |
| cd[buttonText] | Visit%20Site |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"HOKA%C2%AE%20-%20FLY%20HUMAN%20FLY%E2%84%A2"%7D |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.156 |
| r | stable |
| a | tmtealium |
| ec | 3 |
| o | 4126 |
| fbp | fb.1.1717175146687.1460557589 |
| ler | empty |
| cdl | API_unavailable |
| it | 1717175146660 |
| coo | false |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |
| es | automatic |
| tm | 3 |
| rqm | FGET |

47. The "ev" parameter is an "Event." In this case, the event is a "SubscribedButtonClick," indicating to Facebook that the user has viewed a specific webpage on the Website.

48. The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.hoka.com.

49. The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

50. The "fbp" parameter is the Facebook Browser ID, and is used to track the user's activity across the Internet.

51. Similarly, the following type of data is sent to Facebook when a user browses the Teva Website:



| | |
|---|---|
| fbp | fb.1.1717178120432.1483042564 |
| id | 974057282662515 |
| if | false |
| it | 1717178117781 |
| ler | empty |
| o | 6174 |
| r | stable |
| rl | |
| rqm | FGET |
| sh | 1080 |
| sw | 1920 |
| tm | 3 |
| ts | 1717178132216 |
| v | 2.9.156 |

52. Similarly, the following type of data is sent to Facebook when a user browses the Sanuk Website:

GET
200

https://www.facebook.com/privacy_sandbox/pi
.com%2Fhome&rl=https%3A%2F%2Fwww.sanuk.com%
7B%22classList%22%3A%22cm-cta__button%20cm-
F%2Fwww.sanuk.com%2Ftraeger%2F%22%2C%22id%2
%22numChildButtons%22%3A0%2C%22tag%22%3A%22a%

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| a | tmtealium |
| cd[buttonFeatures] | %7B"classList"%3A"cm-cta__button%20cm-cta-button%20cm-teasable__cta%20btn%20btn-alt%20mb-25"%2C"destination"%3A"https%3A%2F%2Fwww.sanuk.com%2Ftraeger%2F"%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"SHOP%20SANUK%20X%20TRAEGER"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | SHOP%20SANUK%20X%20TRAEGER |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"%5Cn%5CnSidewalk%20Surfers%C2%AE%2C%20Sandals%2C%20Shoes%2C%20and%20More!%20%7C%20Sanuk%C2%AE%5Cn%5Cn"%7D |
| cdl | API_unavailable |
| coo | false |
| dl | https%3A%2F%2Fwww.sanuk.com%2Fhome |
| ec | 4 |

| | |
|---|---|
| es | automatic |
| ev | SubscribedButtonClick |
| fbp | fb.1.1717176292787.2038566789 |
| id | 197730767247654 |
| if | false |
| it | 1717176292600 |
| o | 4126 |
| r | stable |
| rl | https%3A%2F%2Fwww.sanuk.com%2Fon%2Fdemandware.store%2FSites-SANUK-US-Site |
| rqm | FGET |
| sh | 1080 |
| sw | 1920 |
| tm | 3 |
| ts | 1717176305215 |
| v | 2.9.156 |

53. Similarly, the following type of data is sent to Facebook when a user browses the Ugg Website:

GET
200

https://www.facebook.com/privacy_sandbox/pixel/reg
F&rl=&if=false&ts=1717176961204&cd[buttonFeatures]
bold-link%20cm-btn-new%20cm-btn-new2%20letter-spac
C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22
2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd[butto

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| a | tmtealium |
| cd[buttonFeatures] | %7B"classList"%3A"cm-cta__button%20cm-cta-button%20cm-teasable__cta%20d-block%20cm-bold-link%20cm-btn-new%20cm-btn-new2%20letter-space-default%20"%2C"destination"%3A"https%3A%2F%2Fwww.ugg.com%2Fgift-boutique%2F"%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"Gifts%20This%20Way"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | Gifts%20This%20Way |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"UGG%C2%AE%20Official%20%7C%20Boots%2C%20Slippers%20%26%20Shoes%20%7C%20Free%20Shipping%20%26%20Returns"%7D |
| cdl | API_unavailable |
| coo | false |
| dl | https%3A%2F%2Fwww.ugg.com%2F |
| dpo | LDU |

| | |
|---|---|
| dpoco | 0 |
| dpost | 0 |
| ec | 2 |
| es | automatic |
| ev | SubscribedButtonClick |
| fbp | fb.1.1717176944967.385694252 |
| id | 1466433443409911 |
| if | false |
| it | 1717176942887 |
| ler | empty |
| o | 6174 |
| r | stable |
| rl | |
| rqm | FGET |
| sh | 1080 |
| sw | 1920 |
| tm | 3 |
| ts | 1717176961204 |
| v | 2.9.156 |

54. Similarly, the following type of data was sent to Facebook when a user browsed the Koolaburra Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**



GET
200
https://www.facebook.com/privacy_sandbox/pixel/reg
.com%2F&rl=&if=false&ts=1717177674911&cd[buttonFea
tn-main%20all-caps%20button%20font-size-10%20bg-co
-color-primary-hover%20letter-space-default%20%22%
3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| a | tmtealium |
| cd[buttonFeatures] | %7B"classList"%3A"cm-cta__button%20cm-cta-button%20cm-teasable__cta%20btn%20btn-main%20all-caps%20button%20font-size-10%20bg-color-white%20mt-3%20ml-0%20m-w-51p%20py-12%20px-18-px%20color-primary%20border-1-solid%20bg-color-primary-hover%20letter-space-default%20"%2C"destination"%3A"https%3A%2F%2Fwww.koolaburra.com%2Fnew-arrivals%2F"%2C"id"%3A""%2C"imageUrl"%3A""%2C"innerText"%3A"EXPLORE%20NEW%20ARRIVALS"%2C"numChildButtons"%3A0%2C"tag"%3A"a"%2C"type"%3Anull%2C"name"%3A""%7D |
| cd[buttonText] | EXPLORE%20NEW%20ARRIVALS |
| cd[formFeatures] | %5B%5D |
| cd[pageFeatures] | %7B"title"%3A"Koolaburra%20by%20UGG%C2%AE%20Official%20Site%20%7C%20Koolaburra.com"%7D |
| cdl | API_unavailable |
| coo | false |
| dl | https%3A%2F%2Fwww.koolaburra.com%2F |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |
| ec | 3 |

| | |
|---|---|
| es | automatic |
| ev | SubscribedButtonClick |
| fbp | fb.1.1717177657533.309121462 |
| id | 119126991893237 |
| if | false |
| it | 1717177656542 |
| ler | empty |
| o | 6174 |
| r | stable |
| rl | |
| rqm | FGET |
| sh | 1080 |
| sw | 1920 |
| tm | 3 |
| ts | 1717177674911 |
| v | 2.9.156 |

55. Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent to Facebook when a user browsed the Hoka Website:

GET 200

https://www.facebook.com/privacy_sandbox/pi
com%2F&rl=&if=false&ts=1717175180413&cd[but
C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%2
2%2C%22type%22%3Anull%7D&cd[buttonText]=Vis
20HUMAN%20FLY%E2%84%A2%22%7D&sw=1920&sh=1080&

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| sb | pQI9ZkmdCAXYrQSQXngSSMep |
| datr | pQI9Zu6rOGZxJLTz7YrqaTVV |
| c_user | 100076133960803 |
| ps_n | 1 |
| xs | 11%3Adi1FNrtx5ix0HA%3A2%3A1715274410%3A-1%3A-1%3A%3AAcVvkmAZ-NuWZ3ARg7alu3UzZ9axclunq2ySU6TK6A |
| fr | 1ogqBFT8sm2CtaHM3.AWWgosdSzB0xY9RReKxTA97cjxo.BmWgMR..AAA.0.0.BmWgMR.AWUXtN1HXq4 |

56. Similar cookies are sent to Facebook when a user browses the Sanuk Website:




57. Similar cookies are sent to Facebook when a user browses the Teva Website:



58. Similar cookies are sent to Facebook when a user browses the Ugg Website:




59. Similar cookies were sent to Facebook when a user browsed the Koolaburra Website:



60. The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

61. In particular, by identifying users who have shown interest in certain products or content, its cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[5] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[6]

62. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[7]

63. Further, along with all of this data, the Facebook software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Facebook:

| | |
|---|---|
| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.0 Safari/537.36 |

64. The "user-agent" corresponds to the device and browser that the user has used to access the Website.

---

[5] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.

[6] https://allaboutcookies.org/what-data-does-facebook-collect.

[7] *Id.*

65. Finally, the data sent to Facebook contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

66. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### 3. Google Cookies (All the Websites).

67. Defendant causes third party cookies to be transmitted to and from users' browsers and devices on the Websites, even after users disable or reject all such cookies (including all categories of Targeted Advertising, Personalization, and Analytics cookies) to and from the **youtube.com**, **google-analytics.com**, **google.com**, **adservice.google.com**, **analytics.google.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[8] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick

[8] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

cookies.[9] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[10]

68. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[11] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

69. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[12] "To measure a website . . . [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page,

---

[9] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[10] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[11] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[12] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[13]

70. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[14]

71. For example, the Google software code that Defendant causes to be stored on and executed by a user's device when the user browses the Hoka Website causes the following data to be sent to Google's advertising domain, at td.doubleclick.net:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

[13] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[14] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).



GET
200
https://td.doubleclick.net/td/rul/877699579
175036776za200&gcd=13l3l3l3l1&dma=0&u_w=192
2Fwww.hoka.com%2Fen%2Fus%2F&hn=www.googlead
d=dYmQxMT&gdid=dYmQxMT&npa=0&us_privacy=1-Y
.141%7CChromium%3B125.0.6422.141%7CNot.A%252F

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 1834927556.1717175146 |
| bg | ffffff |
| cv | 11 |
| data | event=page_view;dimension20=0.519939294 2246326_1717175145004 |
| did | dYmQxMT |
| dma | 0 |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1717175452047 |
| gcd | 13l3l3l3l1 |
| gdid | dYmQxMT |
| gtm | 45be45t0v9175036776za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1717175452047 |
| ref | https://www.hoka.com/en/us/ |
| tiba | Global Running Day \| HOKA® \| United States |
| u_h | 1080 |
| u_w | 1920 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;125.0.6422.141\| Chromium;125.0.6422.141\| Not.A%2FBrand;24.0.0.0 |
| uam | |
| uamb | 0 |

| | |
|---|---|
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| url | https://www.hoka.com/en/us/global-running-day/ |
| us_privacy | 1-Y- |

72. The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing.

73. The "u_h" and "u_w" parameters correspond to the user's screen height and width.

74. The parameters beginning in "ua…" tell Google extensive information about the user's device and browser, including the specific operating system, browser brand, and device processor.

75. In another example, when a user inputs a search string into the Hoka Website, the search string is provided to Google. For instance, the following data was sent to Google when the user searched for the term "chocolate":

GET 200

```
https://td.doubleclick.net/td/rul/877699579
175036776za200&gcd=13l3l3l3l1&dma=0&u_w=192
US%2FCoveo-Show%3Fq%3DTrail%2520Running%26q
Coveo-Suggestions%3Fq%3Dchocolate&hn=www.go
gdid=dYmQxMT&npa=0&us_privacy=1-Y-&pscdl=noap
```

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ref | https://www.hoka.com/on/demandware.store/Sites-HOKA-US-Site/en_US/Coveo-Suggestions?q=chocolate |

76. The "q" variable refers to the user query, which in this case was "chocolate."

77. Data is also sent to Google when users browse the Teva Website. For example:



GET 200

https://td.doubleclick.net/td/rul/877703868?random
cd=13l3l3l3l1&dma=0&u_w=1920&u_h=1080&url=https%3A
s%2C%20River%20Shoes%2C%20Boots%2C%20%26%20More%20
1717178117&fledge=1&data=event%3Dpage_view%3Bdimen

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 51176372.1717178117 |
| bg | ffffff |
| cv | 11 |
| data | event=page_view;dimension20=0.08467566766666357_1717178116538 |
| did | dYmQxMT |
| dma | 0 |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1717178148339 |
| gcd | 13l3l3l3l1 |
| gdid | dYmQxMT |
| gtm | 45be45t0za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1717178148339 |
| tiba | Fashionable Active Sandals, River Shoes, Boots, & More \| Teva® |
| u_h | 1080 |
| u_w | 1920 |
| url | https://www.teva.com/ |
| us_privacy | 1-Y- |

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

78. Data is also sent to Google when users browse the Sanuk Website. For example:

POST
204

https://analytics.google.com/g/collect?v=2&
d=dYmQxMT&cid=919093630.1717176295&ul=en-us
2.141%7CNot.A%252FBrand%3B24.0.0.0&uamb=0&u
p7Saxhk&sid=1717176294&sct=1&seg=1&dl=https
11%2F&dt=No%20Search%20Results%20Found%20%7

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| _et | 1 |
| _p | 1717176332246 |
| _s | 2 |
| are | 1 |
| cid | 919093630.1717176295 |
| dl | https://www.sanuk.com/search?q=chocolate |
| dma | 0 |
| dr | https://www.sanuk.com/mens-view-all/ |
| dt | No Search Results Found \| Sanuk® Official Site |
| en | page_view |
| ep.prodflag | test |
| frm | 0 |
| gcd | 13l3l3l3l1 |
| gdid | dYmQxMT |
| gtm | 45je45t0v894594472za200 |
| npa | 0 |
| pae | 1 |
| pscdl | noapi |
| sct | 1 |
| seg | 1 |
| sid | 1717176294 |
| sr | 1920x1080 |
| tfd | 7509 |
| tid | G-3B8SBQJBP7 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;125.0.6422.141\|<br>Chromium;125.0.6422.141\|<br>Not.A%2FBrand;24.0.0.0 |
| uam | |
| uamb | 0 |

| | |
|---|---|
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| uid | abalP23VJt3kgzEnPjkp7Saxhk |
| ul | en-us |
| v | 2 |

79. Data is also sent to Google when users browse the Ugg Website. For example:

GET
200

https://td.doubleclick.net/td/rul/877699312?random=
cd=13131313l1&dma=0&u_w=1920&u_h=1080&url=https%3A
%3DBLK&hn=www.googleadservices.com&frm=0&tiba=Gold
&pscdl=noapi&auid=1939784477.1717176941&fledge=1&d
3D1142172

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 1939784477.1717176941 |
| bg | ffffff |
| cv | 11 |
| data | event=page_view;ecomm_pagetype=product;google_business_vertical=retail;id=1142172 |
| did | dYmQxMT |
| dma | 0 |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1717177221066 |
| gcd | 13l3l3l3l1 |
| gdid | dYmQxMT |
| gtm | 45be45t0za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1717177221066 |
| tiba | Goldencoast Clog Platform \| UGG® |
| u_h | 1080 |
| u_w | 1920 |
| url | https://www.ugg.com/men-flip-flops/goldencoast-clog/1142172.html?dwvar_1142172_color=BLK |
| us_privacy | 1-Y- |

80. Data was also sent to Google when users browsed the Koolaburra Website. For example:

```
GET  https://td.doubleclick.net/td/rul/875342016?random
200  cd=13l3l3l3l1&dma=0&u_w=1920&u_h=1080&url=https%3A
     %2F&hn=www.googleadservices.com&frm=0&tiba=Women%2
     id=dYmQxMT&npa=0&us_privacy=1-Y-&pscdl=noapi&auid=
```

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| async | 1 |
| auid | 2146021860.1717177657 |
| bg | ffffff |
| cv | 11 |
| data | event=page_view;ecomm_pagetype=category |
| did | dYmQxMT |
| dma | 0 |
| fledge | 1 |
| fmt | 3 |
| frm | 0 |
| fst | 1717177734294 |
| gcd | 13l3l3l3l1 |
| gdid | dYmQxMT |
| gtm | 45be45t0za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1717177734294 |
| ref | https://www.koolaburra.com/ |
| tiba | Women's Sandals, Slides & Wedges \| Koolaburra by UGG® |
| u_h | 1080 |
| u_w | 1920 |
| url | https://www.koolaburra.com/womens-sandals/?sz=7 |
| us_privacy | 1-Y- |

81. Along with the data sent to Google described above, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain. The following cookies were sent to doubleclick.net when a user browsed the Hoka Website:




82. Google documentation confirms that the "IDE" cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[15]

83. Similarly, the following cookies are sent to Google when a user browses the Teva Website:




84. Similarly, the following cookies are sent to Google when a user browses the Sanuk Website:

[15] https://policies.google.com/technologies/cookies?hl=en-US.




85. Similarly, the following cookies are sent to Google when a user browses the Ugg Website:




86. Similarly, the following cookies were sent to Google when a user browsed the Koolaburra Website:



87. The "1P_JAR" cookie is used by google for advertising purposes, on its Google Ads platform.[16]

88. The "NID" cookie is also used for Google advertising. Specifically, it is used to show Google ads to users.[17]

89. Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" and IP address information to be sent to Google.

90. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

91. Thus, the Google cookies used on the Websites cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build

[16] *See* https://business.safety.google/adscookies/.

[17] https://policies.google.com/technologies/cookies?hl=en-US.

leads and sales by bringing previous visitors back to your website to complete what they started."[18]

92. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[19] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**4. Microsoft Bing Cookies (Hoka, Teva, Ugg, and Koolaburra Websites).**

93. Defendant also causes third-party cookies to be transmitted to and from the Hoka, Teva, Ugg, and Koolaburra Websites' users' browsers and devices, even after users elect to disable or reject all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Website to function), to and from the **bat.bing.com** domain. "The webpage bat.bing.com is a host for Bing Ads Conversion tracking code. This webpage is owned by Microsoft[.]"[20] The domain is associated with Bing, Microsoft's search engine, as well as Microsoft's digital advertising and analytics platforms. When a webpage loads a bat.bing.com cookie, it "tells Microsoft Advertising about the user visits to [the] webpage."[21] Microsoft uses bat.bing.com cookies to "record[] what customers do

[18] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[19] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).
[20] https://answers.microsoft.com/en-us/msadvs/forum/all/does-batbing-track-your-browser-searches-and-sites/0a402f00-60c2-4d54-bd7d-81b67ccc7f13.
[21]https://help.ads.microsoft.com/apex/index/3/en/56959#:~:text=The%20most%20important%20request%20is,making%20when%20your%20webpage%20loads.

on [a] website and send[] that information to Microsoft Advertising."[22] Microsoft then serves targeted ads to web users across its extensive ad networks, which utilizes its "rich" supply of gathered data to "reach more than a billion people[.]"[23]

94. Bat.bing.com cookies collect consumers' (i) search history and browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information (including zip code[24]; gender[25]; age[26] (including identifying whether that person is a minor or not)); (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses). Bat.bing.com updates this information each time a user clicks on a website hosting a third-party bat.bing.com cookie. Bat.bing.com keeps this user data for six months.

95. Bat.bing.com cookies help Microsoft track users' interactions with ads (e.g., clicking a link or making a purchase) and provide valuable metrics that advertisers use to measure ad campaign performance. Further, bat.bing.com cookies allow Microsoft to obtain and store at user data to "help [website owners] focus a campaign or ad group on potential audiences who meet [website owners'] specific criteria, so [website owners] can increase the chance that [consumers] see [website owners'] ads."[27] Further, bat.bing.com offers [website owners] valuable "conversion tracking," which is a "measure [of] the ROI (return on investment) of your advertising campaign by letting [website owners] assign a monetary value to the activities people complete on [Defendant's] website after clicking [website owners'] ad."[28]

96. Microsoft also utilizes bat.bing.com data for its own purposes, including by using the data to tailor content and target advertisements to users. This profile enables Microsoft to

[22] https://help.ads.microsoft.com/#apex/ads/en/56960/1.
[23] https://answers.microsoft.com/en-us/msadvs/forum/all/opt-out-of-audience-ads/753bc0fc-c04f-4e20-a94a-abaa950ccf31#:~:text=When%20you%20come%20to%20Microsoft,and%20rich%20first%2Dparty%20data.
[24] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[25] *Id.*
[26] *Id.*
[27] https://help.ads.microsoft.com/#apex/ads/en/60212/0.
[28] https://help.ads.microsoft.com/#apex/ads/en/56680/2.

deliver highly targeted ads within Microsoft's extensive advertising network Microsoft's revenue from its advertising network program has exceeded $10 billion as of 2022.[29]

**5. Snapchat Cookies (All the Websites).**

97. Defendant also causes third party cookies to be transmitted to and from the Websites' users' browsers and devices, even after users elect to disable or reject all cookies except those "Essential" for the Website to function, to and from the **tr.snapchat.com** domain. This subdomain is associated with Snap Inc., the social media company that owns Snapchat. Snapchat is multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[30] This data helps Snap personalize ad content and track users across the internet.[31] As Snap explains, it uses the data collected by Snapchat cookies "for optimization, custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are . . . meant to deliver better results for our ad products."[32]

98. Snapchat cookies allow Snap to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, including age and location,[33] (v) user input data, including name and email address,[34] (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and/or (xii) geolocation data—including whether a user is located in California.

99. For example, the Hoka Website causes the following data to be sent to Snap:

---

[29] https://digiday.com/media/microsofts-ad-revenue-hit-10b-and-its-investing-is-a-sleeping-giant-about-to-wake/.

[30] https://snapdiscoveries.com/what-is-tr-snapchat-com-is-used-for; *see also* Snapchat Business Help Center: Directly Implement the Pixel On Your Website (available at https://businesshelp.snapchat.com/s/article/pixel-direct-implementation).

[31] *Id.*

[32] Snapchat Business Help Center: Pixel Implementation FAQ (available at https://businesshelp.snapchat.com/s/article/snap-pixel-faq); *see also* Snapchat Business Help Center: About Snap Pixel (available at https://businesshelp.snapchat.com/s/article/snap-pixel-about).

[33] *See* Snap for Developers: Parameters (available at https://developers.snap.com/api/marketing-api/Conversions-API/Parameters).

[34] *Id.*

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw | Summary PLAIN


```
{
  "ctx": {
    "a": [
      603,
      631,
      468,
      0,
      1152
    ],
    "bg": true,
    "bt": "1d53c387",
    "c1": "07ad3e93-c548-45bf-9e55-55cb053caf9d",
    "d_a": "x86",
    "d_bvs": "[{\"brand\":\"Google Chrome\",
    \"version\":\"125.0.6422.141\"},
    {\"brand\":\"Chromium\",\"version\":\"125.0.
    6422.141\"},{\"brand\":\"Not.A/Brand\",
    \"version\":\"24.0.0.0\"}]",
    "d_os": "10.0.0",
    "d_ot": "Windows",
    "df": true,
    "huah": true,
    "lc": "bd663381-7bda-4023-97e3-704406ad6fa9",
    "ls": "def1f15d-be95-4149-8754-1bca3447a215",
    "p": [
      603,
      631,
      468,
      1152,
      0
    ],
    "pv": 2,
    "r": "81cb94be-2495-40ff-a8fb-d0a3c66eb7f8",
    "rd": 36716,
    "sa": 1717175146982,
    "sh": 1080,
    "sps": 33494,
    "ss": "dfb3769b-e0ee-4b86-9d70-f077a429b9d0",
    "sw": 1920,
    "ts": 1717175180476,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64;
    x64) AppleWebKit/537.36 (KHTML, like Gecko)
    Chrome/125.0.0.0 Safari/537.36",
    "url": "https://www.hoka.com/",
    "v": "3.18.0-2405302111"
  },
```

```
"req": [
  {
    "del": 39,
    "md": {
      "pids": [
        "2709d3da-ec38-4d0e-878d-f899599a0fe8"
      ],
      "ps": false
    }
  },
  {
    "del": 37,
    "md": {
      "btx": "Visit Site",
      "pids": [
        "2709d3da-ec38-4d0e-878d-f899599a0fe8"
      ]
    }
  }
],
"u_scsid":
"dfb3769b-e0ee-4b86-9d70-f077a429b9d0"
}
```


100. Similar data is sent to Snap when a user browses the Teva Website:

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "ctx": {
    "a": [
      1434,
      1484,
      818,
      0,
      2865
    ],
    "bg": true,
    "bt": "1d53c387",
    "c1": "e99bb2b2-8bbd-473f-b3ab-f27d57c18d46",
    "d_a": "x86",
    "d_bvs": "[{\"brand\":\"Google Chrome\",
    \"version\":\"125.0.6422.141\"},
    {\"brand\":\"Chromium\",\"version\":\"125.0.6422.
    141\"},{\"brand\":\"Not.A/Brand\",\"version\":\"24.0.
    0.0\"}]",
    "d_os": "10.0.0",
    "d_ot": "Windows",
    "df": true,
    "huah": true,
    "lc": "cb0d0580-11a8-4da5-a56a-66aaa6f7f359",
    "ls": "d76da6ed-b1f1-4f15-8d18-37c8e3682624",
    "p": [
      1434,
      1484,
      818,
      2865,
```

```
      0
    ],
    "pv": 2,
    "r": "b209a969-c471-4176-ad2a-e7d7014ebaad",
    "rd": 19298,
    "sa": 1717178117647,
    "sh": 1080,
    "sps": 14623,
    "ss": "b349d04f-ed45-4036-82bd-dcbeb725a056",
    "sw": 1920,
    "ts": 1717178132270,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.
    0 Safari/537.36",
    "url": "https://www.teva.com/",
    "v": "3.18.0-2405302111"
  },
  "req": [
    {
      "del": 17,
      "md": {
        "pids": [
          "477ae318-68b8-4624-9581-1a995f3d63cd"
        ],
        "ps": false
      }
    }
  ],
  "u_scsid": "b349d04f-ed45-4036-82bd-dcbeb725a056"
}
```


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

101. Similar data is sent to Snap when a user browses the Sanuk Website:

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "ctx": {
    "a": [
      1896,
      1914,
      1086,
      1,
      2117
    ],
    "bg": true,
    "bt": "1d53c387",
    "c1": "c68fe81a-74b1-42de-98b1-78e234b2bca7",
    "d_a": "x86",
    "d_bvs": "[{\"brand\":\"Google Chrome\",
    \"version\":\"125.0.6422.141\"},
    {\"brand\":\"Chromium\",\"version\":\"125.0.6422.
    141\"},{\"brand\":\"Not.A/Brand\",\"version\":\"24.0.
    0.0\"}]",
    "d_os": "10.0.0",
    "d_ot": "Windows",
    "df": true,
    "huah": true,
    "lc": "0f19c6df-829d-4eeb-b1a8-5d9e1808cb36",
    "ls": "1ee0daaf-d3eb-4b93-b26e-bef1fda7e801",
    "p": [
      1896,
      1914,
      1086,
      2117,
```

```
      1
    ],
    "pv": 2,
    "r": "8d6dfa52-845b-40bf-8ef0-dd9c940b4db2",
    "rd": 16221,
    "rf": "https://www.sanuk.com/on/demandware.store/
    Sites-SANUK-US-Site",
    "sa": 1717176293011,
    "sh": 1080,
    "sps": 16220,
    "ss": "266784c7-7075-4dd2-84dc-dd16d91263e5",
    "sw": 1920,
    "ts": 1717176305331,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.
    0 Safari/537.36",
    "url": "https://www.sanuk.com/home",
    "v": "3.18.0-2405302111"
  },
  "req": [
    {
      "del": 98,
      "md": {
        "pids": [
          "20da88d4-8679-4f30-8fea-e11e5b9e6618"
        ],
        "ps": false
      }
    }
  ],
  "u_scsid": "266784c7-7075-4dd2-84dc-dd16d91263e5"
}
```


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

102. Similar data is sent to Snap when a user browses the Ugg Website:



```
      0
    ],
    "pv": 2,
    "r": "c58e9c9d-3b3d-4b8a-82b5-42f43574e1f0",
    "rd": 23440,
    "sa": 1717176942482,
    "sh": 1080,
    "sps": 18773,
    "ss": "2dfe27e8-b141-4355-a6d7-81baf066327c",
    "sw": 1920,
    "ts": 1717176961255,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.
    0 Safari/537.36",
    "url": "https://www.ugg.com/",
    "v": "3.18.0-2405302111"
  },
  "req": [
    {
      "del": 17,
      "md": {
        "pids": [
          "3259067f-1e1b-4526-b964-f035ea3a59ae"
        ],
        "ps": false
      }
    }
  ],
  "u_scsid": "2dfe27e8-b141-4355-a6d7-81baf066327c"
}
```


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]**

103. Similar data was sent to Snap when a user browsed the Koolaburra Website:

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "ctx": {
    "a": [
      1808,
      1833,
      1279,
      0,
      2892
    ],
    "bg": true,
    "bt": "1d53c387",
    "c1": "854713eb-a3a4-4380-a642-62dce6544124",
    "d_a": "x86",
    "d_bvs": "[{\"brand\":\"Google Chrome\",
    \"version\":\"125.0.6422.141\"},
    {\"brand\":\"Chromium\",\"version\":\"125.0.6422.
    141\"},{\"brand\":\"Not.A/Brand\",\"version\":\"24.0.
    0.0\"}]",
    "d_os": "10.0.0",
    "d_ot": "Windows",
    "df": true,
    "huah": true,
    "lc": "305b0f4a-c606-4b1e-9355-d1b6d037206b",
    "ls": "1b582acf-3329-47a7-84a9-305f89831c8f",
    "p": [
      1808,
      1833,
      1279,
      2892,
```

```
      0
    ],
    "pv": 2,
    "r": "c5a7df3f-6836-4a18-80fc-49fc6a7c1edf",
    "rd": 22688,
    "sa": 1717177656610,
    "sh": 1080,
    "sps": 18382,
    "ss": "1ac0573f-9d6e-4462-a700-04e352c1d285",
    "sw": 1920,
    "ts": 1717177674992,
    "ua": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
    AppleWebKit/537.36 (KHTML, like Gecko) Chrome/125.0.0.
    0 Safari/537.36",
    "url": "https://www.koolaburra.com/",
    "v": "3.18.0-2405302111"
  },
  "req": [
    {
      "del": 53,
      "md": {
        "pids": [
          "9fea86ff-0800-479f-8d3d-645d7769f2c7"
        ],
        "ps": false
      }
    }
  ],
  "u_scsid": "1ac0573f-9d6e-4462-a700-04e352c1d285"
}
```


104. Along with this data, the following cookie data is sent to Snap when a user browses the Hoka Website:

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| sc_at | v2\|H4sIAAAAAAAAALNIskxOMzRJ0jU1NTHSNUk1Tda1NEtM0U0yTTY0MzJLM0oxt6gxNDGwMjQHQVNDU6MaJKYBAJNyhW9AAAAA |

105. Similar cookie data is sent to Snap when a user browses the Teva Website:

POST 200 https://tr.snapchat.com/p

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| sc_at | v2\|H4sIAAAAAAAAALNIskxOMzRJ0jU1NTHSNUk1Tda1NEtM0U0yTTY0MzJLM0oxt6gxNDGwMjQHQQtDI4MaJKYBAD/lmSVAAAAA |

106. Similar cookie data is sent to Snap when a user browses the Sanuk Website:




107. Similar cookie data is sent to Snap when a user browses the Ugg Website:




108. Similar cookie data was sent to Snap when a user browsed the Koolaburra Website:




109. According to Snap Inc.'s documentation, the "sc_at" cookie is "[u]sed to identify a visitor across multiple domains," meaning that it is a tracking cookie capable of tracking a user even after the user exits Website and browses other sites.[35] The documentation also confirms that the cookie persists on the user's device for a period of one year.[36]

[35] *See* https://www.snap.com/privacy/cookie-information.
[36] *See id.*

**6. Tealium Cookies (All the Websites).**

110. Defendant also causes third party cookies to be transmitted to and from the Websites' users' browsers and devices, even after users elect to disable or reject all cookies except those "Essential" for the Website to function, to and from the **tealiumiq.com** domain.

111. This domain is associated with Tealium, Inc.,[37] a Customer Data Platform (CDP)[38] providing enterprise-level tag management[39] and audience segmentation.[40] Its "iQ Tag Management" service functions as a "container"[41] to deploy other third-party tracking tags (like those from Google or Facebook) onto a user's browser,[42] while its server-side AudienceStream platform collects data from these interactions to build persistent visitor profiles to "[s]titch together customer data... into a single, persistent visitor profile." [43]

112. Tealium's cookies, including "utag_main" (which contains the visitor ID v_id)[44] and the cross-domain "TAPID" cookie, assign a unique, persistent identifier to a user's browser.[45] These cookies allow Tealium to obtain and store user data, including: (i) browsing history; (ii) website interactions (like page views, content viewed, and products added to a cart); (iii) search terms; (iv) social shares; (v) video plays; and (vi) other "Visitor attributes" that persist for the "lifetime of the user," such as "Lifetime Order Value."[46]

---

[37] *See, e.g.*, Tealium Cmty., *Data Collection Endpoint*, https://community.tealiumiq.com/t5/Server-Side/Data-Collection-Endpoint/ta-p/17921 (last visited Nov. 4, 2025) (describing the collect.tealiumiq.com domain;

[38] Tealium, *Tealium is the #1 Customer Data Platform*, https://tealium.com/ (last visited Nov. 4, 2025).

[39] Tealium, *Tealium iQ Tag Management*, https://tealium.com/products/iq-tag-management/ (last visited Nov. 4, 2025).

[40] Tealium, *Tealium AudienceStream CDP*, https://tealium.com/products/audiencestream-cdp/ (last visited Nov. 4, 2025) (describing tools to "Create audiences with our segmentation tools").

[41] Tealium Cmty., *What is tiqcdn?*, https://community.tealiumiq.com/t5/iQ-Tag-Management/What-is-tiqcdn/ta-p/17812 (last visited Nov. 4, 2025) (stating "The utag.js file is the 'container' tag").

[42] Tealium, *Tealium iQ Tag Management*, https://tealium.com/products/iq-tag-management/ (last visited Nov. 4, 2025) (explaining the service helps to "Deploy and manage your vendor tags").

[43] Tealium, *Tealium AudienceStream CDP*, https://tealium.com/products/audiencestream-cdp/ (last visited Nov. 4, 2025) (describing the ability to "stitch together customer data... into a single, persistent visitor profile).

[44] Tealium Cmty., *utag_main Cookie*, https://community.tealiumiq.com/t5/iQ-Tag-Management/utag-main-Cookie/ta-p/17808 (last visited Nov. 4, 2025) (describing the utag_main cookie as containing the v_id - A unique 16-digit visitor ID).

[45] Tealium Cmty., *utag_main Cookie*, https://community.tealiumiq.com/t5/iQ-Tag-Management/utag-main-Cookie/ta-p/17808 (last visited Nov. 4, 2025) (describing the v_id as a "unique 16-digit visitor ID")].

[46] *See* Tealium, *Tealium AudienceStream CDP*, https://tealium.com/products/audiencestream-cdp/ (last visited Nov. 4, 2025) (describing capture of "preferences, behaviors, and lifetime value... for the lifetime of the user").; *See also* Tealium Docs, *Tracking Variables*, https://docs.tealium.com/platforms/javascript-tracking-library/tracking-variables/ (last visited Nov. 4, 2025) (listing standard variables for collection, including product_id, search_keyword, video_id, and social_share_type).

113. Tealium aggregates this data to create “unified customer profiles”[47] and “audiences” (segments of visitors with shared traits), which are then used to “fuel” its marketing stack that transmit this data to other ad vendors in real-time.[48] This process involves “persistent cookie matching”[49] which synchronizes Tealium’s visitor IDs with those of third-party vendors like The Trade Desk, Criteo, and Yahoo,[50] allowing Tealium to associate a user’s events across multiple, unrelated domains with the same profile[51] so advertisers can receive this enriched data for targeted advertising and personalization.[52]

114. The data sent to Tealium after users reject all cookies can be quite extensive. For example, the following data was sent to Tealium after users rejected cookies on the Koolaburra Website:


```
{
    "loader.cfg":{
        "4":{
            "load":4,
            "send":1,
            "v":202405091822,
            "wait":1,
            "tid":7132,
            "id":"4",
            "executed":1
        },
        "5":{
            "load":1,
            "send":1,
            "v":202404172036,
            "wait":1,
            "tid":7133,
            "id":"5",
            "executed":1
        },
```


[47] Tealium, *Tealium AudienceStream CDP*, https://tealium.com/products/audiencestream-cdp/ (last visited Nov. 4, 2025) (stating the platform helps to “Build unified customer profiles”).
[48] *Id.*
[49] Tealium Cmty., *Persistent Cookie Matching with AudienceStream*, https://community.tealiumiq.com/t5/AudienceStream-Connectors/Persistent-Cookie-Matching-with-AudienceStream/ta-p/17953 (last visited Nov. 4, 2025).
[50] Tealium Cmty., *Connector Marketplace*, https://community.tealiumiq.com/t5/AudienceStream-Connectors/Connector-Marketplace/ta-p/17709 (last visited Nov. 4, 2025) (listing available connectors for “The Trade Desk,” “Criteo,” and “Yahoo”).
[51] Tealium Cmty., *TAPID (Visitor ID)*, https://community.tealiumiq.com/t5/AudienceStream-Connectors/TAPID-Visitor-ID/ta-p/34620 (last visited Nov. 4, 2025) (explaining the TAPID is used to “identify visitors across multiple domains”).
[52] Tealium, *Tealium AudienceStream CDP*, https://tealium.com/products/audiencestream-cdp/ (last visited Nov. 4, 2025) (describing how Tealium’s offerings “activate audiences... to create more relevant, personalized customer experiences”).

```
  "data":{
     "brand_name":"KOOLABURRA",
     "country_code":"US",
     "currency_code":"USD",
     "customer_registered":false,
     "device_type":"desktop",
     "language_code":"en",
     "page_name":"Tayla Sandal",
     "page_type":"product",
     "site_id":"KOOLABURRA-US",
     "cart_total_items":0,
     "cart_total_value":0,
     "coveo_search_token":"eyJhbGciOiJIUzI1NiJ9.eyJzZWFyY
     2hIdWIiOiJzZWFyY2gta29vbGEtdXMtZW4iLCJ2OCI6dHJ1ZSwid
     G9rZW5JZCI6InN1ZHB4d2x1N3JnN2NzZnQ0MzRvN2VzamRhIiwib
     3JnYW5pemF0aW9uIjoiZGVja2Vyc291dGRvb3Jjb3Jwb3JhdGlvb
     nByb2R1Y3Rpb25rZnc1YXdnOSIsInVzZXJJZHMiOlt7InR5cGUiO
     iJVc2VyIiwibmFtZSI6ImFub255bW91c191c2VyQGFub255bW91c
     y5jb3Zlby5jb20iLCJwcm92aWRlciI6IkVtYWlsIFNlY3VyaXR5I
     FByb3ZpZGVyIn1dLCJyb2xlcyI6WyJxdWVyeUV4ZWN1dG9yIl0sI
     mlzcyI6IlNlYXJjaEFwaSIsImV4cCI6MTcxNzI2NDEwMiwiaWF0I
     joxNzE3MTc3NzAyfQ.-Duhf2GVqew7jYj_flp6tntM
     C2T_E8PPzPt3KyxJxfk",
     "coveo_website_context":"KOOLABURRA-US",
     "product_availability":[
        "IN_STOCK"
     ],
     "product_brand":[
        "KOOLABURRA"
     ],
     "product_id":[
        "1152661"
     ],
     "productDyId":[
        "197634045757"
     ],
     "product_image_url":[

     ],
     "product_name":[
        "Tayla Sandal"
     ],
     "product_original_price":[
        "69.99"
     ],
     "product_price":[
        "59.99"
     ],
```

```
"product_sku":[
   "1152661"
],
"product_subcategory":[

],
"product_upc":[

],
"product_url":[
   "/womens-sandals/tayla-sandal/1152661.html"
],
"product_group":[
   "women"
],
"product_category":[
   "koola-pricing",
   "trending",
   "women-categories",
   "women-featured",
   "womens-sandals",
   "womens-view-all",
   "gifts",
   "gifts-for-her",
   "new-arrivals",
   "women-new-arrivals",
   "womens"
],
"cp.utag_main_v_id":"018fcfc39e6b0002984d3a99903b050
6f001b06700bd0",
"cp.utag_main__sn":"1",
"cp.utag_main__se":"17",
"cp.utag_main__ss":"0",
"cp.utag_main__st":"1717179535793",
"cp.utag_main_ses_id":"1717177654894",
"cp.utag_main__pn":"8",
"cp.utag_main__prevpage":"category",
"cp.utag_main_dc_visit":"1",
"cp.utag_main_dc_event":"9",
"cp.utag_main_dc_region":"us-west-2",
"cp.utag_main_productlist":"Women: Footwear:
Sandals",
"cp.dwac_0e216f000a3a01072df8c2073a":"nTYq_MvlT9vnQ7
0IBf__RdP-p6siLbmEHRk=|dw-only|||USD|false|US/
Pacific|true",
"cp.cqcid":"adaz69LLbzhH44MZQesUOY4ryz",
"cp.cquid":"||",
"cp.sid":"nTYq_MvlT9vnQ70IBf__RdP-p6siLbmEHRk",
"cp.dwanonymous_e9caaaad3f61a3dcf1212425d2285a1d":"a
daz69LLbzhH44MZQesUOY4ryz",
"cp.__cq_dnt":"0",
```

```
"cp.dw_dnt":"0",
"cp.layer0_destination":"production",
"cp.layer0_eid":"ba66a84a-d2cc-49a1-8adf-bbc524d11a94",
"cp.osano_consentmanager_uuid":"6e9a4e84-d949-4e71-9d9d-d69baac95927",
"cp._dy_ses_load_seq":"42944:1717177653231",
"cp._dy_csc_ses":"t",
"cp._dy_c_exps":"",
"cp.visitCount":"0",
"cp._dycnst":"dg",
"cp.locale_pref":"en_US",
"cp._dyid":"-5089067336693316896",
"cp._dyjsession":"396c3fd77448581f787a4ac43beec476",
"cp.dy_fs_page":"www.koolaburra.com",
"cp._dy_lu_ses":"396c3fd77448581f787a4ac43beec476:1717177654680",
"cp._dycst":"dk.w.c.ss.",
"cp._dy_geo":"US.NA.US_CA.US_CA_San Francisco",
"cp._dy_df_geo":"United States.California.San Francisco",
"cp._dy_toffset":"0",
"cp.intent_audience":"unknown",
"cp._dy_cs_gcg":"Dynamic Yield Experiences",
"cp._dy_cs_cookie_items":"_dy_cs_gcg",
"cp._dy_soct":"491288.904172.1717177653*709346.1354986.1717177654*720442.1377951.1717177654*757757.1443072.1717177654*830525.1630749.1717177654*914556.1933898.1717177654*947795.2040168.1717177654*954157.2057378.1717177654*954293.2057598.1717177654",
"cp.ftr_ncd":"6",
"cp._dyid_server":"-5089067336693316896",
"cp._rdt_uuid":"1717177656557.c21cfb9c-ed7a-4401-a23e-30a902b64d34",
"cp._scid":"854713eb-a3a4-4380-a642-62dce6544124",
"cp._scid_r":"854713eb-a3a4-4380-a642-62dce6544124",
"cp._cs_mk_ga":"0.8948341607794599_1717177656641",
"cp._gcl_au":"1.1.2146021860.1717177657",
"cp._uetsid":"de36b8b01f7511ef9a0b07de4bef92d9",
"cp._uetvid":"de3762901f7511efb371cf1cbf4ae9a5",
"cp._fbp":"fb.1.1717177657533.309121462",
"cp.__cq_uuid":"abhGd8YJQnR2fvSrhs3jXi2vdJ",
"cp.__cq_seg":"0~0.00!1~0.00!2~0.00!3~0.00!4~0.00!5~0.00!6~0.00!7~0.00!8~0.00!9~0.00",
"cp._cs_c":"0",
"cp._cs_id":"e9f33254-a482-a5f2-dc8e-0f3de90b4e26.1717177658.1.1717177658.1717177658.1.1751341658924.1",
"cp._cs_s":"1.0.0.1717179458927",
```

```
"cp._pin_unauth":"dWlkPU9ERXpOMk5tTm1NdE1qUTVPUzAwT0
RZeExUZ3hObUl0WVROaFpUa3daRFV4WWpJMQ",
"cp._sctr":"1|1717138800000",
"cp._sc_cspv":"https://tr6.snapchat.com/p",
"cp.__attentive_id":"aec673c1920e4634ad64da360b5bbb3
1",
"cp._attn_":"eyJ1Ijoie1wiY29cIjoxNzE3MTc3NjU5NDYyLFw
idW9cIjoxNzE3MTc3NjU5NDYyLFwibWFcIjoyMTkwMCxcImluXCI
6ZmFsc2UsXCJ2YWxcIjpcImFlYzY3M2MxOTIwZTQ2MzRhZDY0ZGE
zNjBiNWJiYjMxXCJ9In0=",
"cp.__attentive_cco":"1717177659472",
"cp.__attentive_pv":"1",
"cp.__attentive_ss_referrer":"ORGANIC",
"cp.__attentive_dv":"1",
"cp.AMP_TOKEN":"$NOT_FOUND",
"cp._gid":"GA1.2.395342719.1717177660",
"cp.mdLogger":"false",
"cp.kampyle_userid":"4f71-b5ca-1b69-511f-c5cc-362f-b
f51-4cd6",
"cp.kampyleUserSession":"1717177659999",
"cp.kampyleUserSessionsCount":"1",
"cp.kampyleSessionPageCounter":"1",
"cp.kampyleUserPercentile":"13.948187455931649",
"cp._dd_s":"rum=0&expire=1717178571964",
"cp.osano_consentmanager":"TGRp45R0AtWYIfB-wY0iZyKCg
u_KeKo7oO4l8Cri1aXXzZtXKD1dSAv38K0hSq4NW0M0laBRhHz2f
Eud1lbXeO9jp7A0JBjAvxd1t4Elc0QqOdZ59ozemDKQLzYl6SU6c
rXP_MeTcq7m5H_PuyJMZv1eojjbH_FdzhV7Mtsz8hYeTsbtBmWYR
smJ79s-TIQUnBpFqcLpPaOyHkun10-n5_31nUHXYT3h0wz-9J0ZB
YhzMoUghrXlSyyiTVS99n9APLxjyKSJcKF75fzq4XPvkGYb2CG8O
Z_R",
"cp.__pr.1p17":"PrB6Eh6C6x",
"cp.apt_pixel":"eyJkZXZpY2VJZCI6IjAyY2E0NWM3LTFkMzgt
NDE0MS1hOGQxLTMxOWI2YTQxNjhjNSIsInVzZXJJZCI6bnVsbCwi
ZXZlbnRJZCI6MX0=",
"cp.amp_f24a38":"i9ySUo_GhlMr9uN6R9QUmR...1hv7s89od.
1hv7s89od.0.0.0",
"cp.amp_f24a38_koolaburra.com":"i9ySUo_GhlMr9uN6R9QU
mR...1hv7s89od.1hv7s89p6.0.0.0",
```

```
"cp.coveo_search_token":"eyJhbGciOiJIUzI1NiJ9.eyJzZW
FyY2hIdWIiOiJzZWFyY2gta29vbGEtdXMtZW4iLCJ2OCI6dHJ1ZS
widG9rZW5JZCI6InN1ZHB4d2x1N3JnN2NzZnQ0MzRvN2VzamRhIi
wib3JnYW5pemF0aW9uIjoiZGVja2Vyc291dGRvb3Jjb3Jwb3JhdG
lvbnByb2R1Y3Rpb25rZnc1YXdnOSIsInVzZXJJZHMiOlt7InR5cG
UiOiJVc2VyIiwibmFtZSI6ImFub255bW91c191c2VyQGFub255bW
91cy5jb3Zlby5jb20iLCJwcm92aWRlciI6IkVtYWlsIFNlY3VyaX
R5IFByb3ZpZGVyIn1dLCJyb2xlcyI6WyJxdWVyeeUV4ZWN1dG9yIl
0sImlzcyI6IlNlYXJjaEFwaSIsImV4cCI6MTcxNzI2NDEwMiwiaW
F0IjoxNzE3MTc3NzAyfQ.-Duhf2GVqew7jYj_flp6t
ntMC2T_E8PPzPt3KyxJxfk",
"cp._ga_8ZTZDRKQGE":"GS1.1.1717177658.1.1.1717177730
.57.0.0",
"cp._ga":"GA1.2.1464387223.1717177659",
"cp._gat_gtag_UA_123982854_11":"1",
"cp.forterToken":"42d68e87b59148d9a1381929e23acbbd_1
717177735732__UDF43_6",
"cp.datadome":"FN8ak7Tg3BVyKwmc6kkWsoAy~F05TArW94JGt
OzGaDQla3QY9H5nE9XdWEWJ2enlFVtVlgK~dil7RhF_WUeFWqSoa
tcO_WxjdlTE14EBIWjiIKfPNRLE245aV7Jy14CM",
"meta.viewport":"width=device-width,
initial-scale=1",
"meta.description":"Tayla Sandal",
"meta.keywords":"Tayla Sandal",
"meta.twitter:card":"summary",
"meta.twitter:title":"Koolaburra® Tayla Sandal for
Women | Koolaburra®",
"meta.twitter:url":"https://www.koolaburra.com/
womens-sandals/tayla-sandal/1152661.html",
"meta.twitter:description":"Tayla Sandal",
"meta.og:title":"Koolaburra® Tayla Sandal for Women
| Koolaburra®",
"meta.og:description":"Tayla Sandal",
"meta.apple-mobile-web-app-title":"UGG",
"meta.application-name":"UGG",
"meta.msapplication-TileColor":"#ffffff",
"meta.msapplication-config":"/on/demandware.static/
Sites-KOOLABURRA-US-Site/-/default/dwec7d9de1/images
/favicons/browserconfig.xml",
"meta.theme-color":"#ffffff",
```

```
"meta.google-site-verification":"Vq4I5bqWTcti0JcRcdqDMSThI_PNFoWpHB7t_kl11tE",
"meta.facebook-domain-verification":"u2ibsz8jpjmi5xgg6awiw7qzemftf5",
"meta.coremedia_content_id":"51438",
"dom.referrer":"https://www.koolaburra.com/womens-sandals/?sz=7",
"dom.title":"Koolaburra® Tayla Sandal for Women | Koolaburra®",
"dom.domain":"www.koolaburra.com",
"dom.query_string":"",
"dom.hash":"",
"dom.url":"https://www.koolaburra.com/womens-sandals/tayla-sandal/1152661.html",
"dom.pathname":"/womens-sandals/tayla-sandal/1152661.html",
"dom.viewport_height":953,
"dom.viewport_width":567,
"ut.domain":"koolaburra.com",
"ut.version":"ut4.46.202405211924",
"ut.event":"view",
"ut.visitor_id":"018fcfc39e6b0002984d3a99903b0506f001b06700bd0",
"ut.session_id":"1717177654894",
"ut.account":"deckers",
"ut.profile":"koola-usa",
"ut.env":"prod",
"tealium_event":"product",
"tealium_visitor_id":"018fcfc39e6b0002984d3a99903b0506f001b06700bd0",
"tealium_session_id":"1717177654894",
"tealium_session_number":"1",
"tealium_session_event_number":"17",
"tealium_datasource":"ybxcuz",
"tealium_account":"deckers",
"tealium_profile":"koola-usa",
"tealium_environment":"prod",
"tealium_random":"3242940489158892",
"tealium_library_name":"utag.js",
"tealium_library_version":"4.46.0",
"tealium_timestamp_epoch":1717177735,
"tealium_timestamp_utc":"2024-05-31T17:48:55.797Z",
"tealium_timestamp_local":"2024-05-31T10:48:55.797",
```

```
"ga_tracking_id":"UA-123982854-11",
"_ccity":"",
"_ccountry":"",
"_ccurrency":"",
"_ccustid":"",
"_corder":"",
"_cpromo":"",
"_cship":"",
"_cstate":"",
"_cstore":"",
"_csubtotal":"",
"_ctax":"",
"_ctotal":"",
"_ctype":"",
"_czip":"",
"_cprod":[
   "1152661"
],
"_cprodname":[
   "Tayla Sandal"
],
"_cbrand":[
   "KOOLABURRA"
],
"_ccat":[
   "koola-pricing",
   "trending",
   "women-categories",
   "women-featured",
   "womens-sandals",
   "womens-view-all",
   "gifts",
   "gifts-for-her",
   "new-arrivals",
   "women-new-arrivals",
   "womens"
],
"_ccat2":[

],
"_cquan":[

],
```

```
      "_cprice":[
         "59.99"
      ],
      "_csku":[

      ],
      "_cpdisc":[

      ],
      "previous_page_name":"category",
      "product_price_converted":[
         "59.99"
      ],
      "product_original_price_converted":[
         "69.99"
      ],
      "product_discount_amount_converted":[

      ],
      "site_country_page":"KOOLABURRA-US-US-product",
      "site_country":"KOOLABURRA-US-US",
      "site_page":"KOOLABURRA-US-product",
      "product_color":[
         null
      ],
      "product_style_colorway":[
         "1152661"
      ],
      "gtag_debugging":"--view-",
      "gtag_sample_rate":1,
      "product_sale_flag":[
         "Discounted"
      ],
      "ga_client_id":"1464387223.1717177659",
      "lang_locale":"en_US",
      "language":"en",
      "actual_product_group":[
         "women"
      ],
      "deduped_product_group":[

      ],
      "deduped_product_id":[

      ],
```

```
            "deduped_product_name":[

            ],
            "summed_product_group_quantity":[

            ],
            "summed_product_id_quantity":[

            ],
            "summed_product_name_quantity":[

            ],
            "timing.domain":"www.koolaburra.com",
            "timing.pathname":"/womens-sandals/",
            "timing.query_string":"",
            "timing.timestamp":1717177733478,
            "timing.dns":0,
            "timing.connect":0,
            "timing.response":4,
            "timing.dom_loading_to_interactive":846,
            "timing.dom_interactive_to_complete":685,
            "timing.load":3,
            "timing.time_to_first_byte":800,
            "timing.front_end":1568,
            "timing.fetch_to_response":800,
            "timing.fetch_to_complete":2372,
            "timing.fetch_to_interactive":1687,
            "fb_event_id_ViewContent":"3c3f695fad6dc1bf51c6f088f3712dbe",
            "fb_event_id_ViewContent_77":"3c3f695fad6dc1bf51c6f088f3712dbe",
            "fb_event_id_PageView":"29de4d43a2495b4bf0e1276e6450b257",
            "fb_event_id_PageView_77":"29de4d43a2495b4bf0e1276e6450b257",
            "snap_event_id_VIEW_CONTENT_12":"c3c6bc60e41ca69e0362e9a849c8cc12",
            "snap_event_id_PAGE_VIEW_12":"85a5fdcec6d1a6ada73cea2c0a7b1dd1",
            "tiktok_event_id_ViewContent":"0467c6fc5606842825c4c97f1aa94ab2",
            "tiktok_event_id_ViewContent_143":"0467c6fc5606842825c4c97f1aa94ab2"
        },
        "browser":{
            "height":953,
            "width":567,
            "screen_height":1080,
            "screen_width":1920,
            "timezone_offset":420
        },
        "event":"view",
        "post_time":1717177737381
    }
```


(Some extraneous data omitted for brevity).

115. Not only does this data contain detailed information about the exact product—down to the SKU—that the user was viewing on the Website; it also contains extensive information about the user's identifiers for and engagement with other parties, such as TikTok, SnapChat, Facebook and Google.

116. Cookie data is also sent to Tealium after users reject cookies on the Websites. For example, the following type of cookie data is sent to Tealium when a user browses the Hoka Website:




117. Similar cookie data is sent to Tealium when a user browses the Teva Website:




118. Similar cookie data is sent to Tealium when a user browses the Sanuk Website:




119. Similar cookie data is sent to Tealium when a user browses the Ugg Website:




120. Similar cookie data was sent to Tealium when a user browsed the Koolaburra Website:




121. According to Tealium documentation, the "TAPID" cookie was "designed to facilitate cross-domain identification."[53] The cookie is designed to enhance the functionality of Tealium's AudienceStream, which is designed "to create highly granular, persistent unified customer profiles of [website] visitors; enrich these profiles with powerful additive data; and then leverage the data anywhere within [website] marketing technology stack to trigger real-time

[53] https://docs.tealium.com/server-side/visitor-stitching/tapid/.

marketing actions."[54] Tealium's documentation states that "AudienceStream always uses the TAPID identifier as the primary identifier if it is present in an incoming request."[55]

122. Along with the cookie data, Tealium receives the user's user-agent information and IP address.

**D. The Third Parties Intercept User Communications While in Transit.**

123. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

124. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

125. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[56] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[57] This deduplication occurs as the communications are received, before they are stored.

---

[54] https://tealium.com/resource/datasheet/tealium-audiencestream/

[55] https://docs.tealium.com/server-side/visitor-stitching/tapid/

[56] For example, Google's server-to-server API is the **Google Ads Conversion API**. Facebook's is the **Meta Conversions API**. Snapchat's is the **Snapchat Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[57] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events,"

126. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

127. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

128. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

129. For example, Meta (formerly Facebook) has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and

available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[58]




130. As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines ***before*** being stored in the data "Warehouse."

131. Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[59]

**E. The Signaling and Addressing Information Intercepted by the Third Parties.**

132. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's

[58] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).
[59] *Id.* at 2:05.

destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

133. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

134. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

135. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation

and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F. The Private Communications Collected are Valuable.**

136. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Websites' users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

137. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate web design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular footwear products and then target those users with advertisements for similar products both on the Websites and across unrelated third-party websites.

138. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader footwear market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

139. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal

information is an important currency in the new millennium."[60] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

140. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

141. By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

## **PLAINTIFFS' EXPERIENCES**

### **Plaintiff Ortiz**

142. Plaintiff Ortiz visited the Hoka Website to seek information about Defendants' products, specifically its Hoka brand of footwear, while located in California, on one or more occasions during the last four years, including in or around April or May 2025.

143. Plaintiff Ortiz's visits to the Hoka Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiffs Ortiz is not a consumer advocate, a "tester," or a compliance auditor that visited the Hoka Website to test or evaluate Defendant's privacy practices.

144. Specifically, Plaintiff Ortiz searched for specific models and sizes of Hoka shoes in the "Men" section of the Hoka Website that he was interested in purchasing. He read Hoka's product descriptions for the products and read customer reviews posted about the products because he was interested in learning about their durability and comfort.

---

[60] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

145. When Plaintiff Ortiz visited the Hoka Website, the Hoka Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Manage Preferences" link. Plaintiff Ortiz viewed Defendant's representation on the popup cookie consent banner that, "This website utilizes technologies such as cookies to enable essential site functionality, as well as for analytics, personalization, and targeted advertising purposes." Plaintiff Ortiz also viewed Defendant's additional representation that users could, rather than choosing to accept all such cookies, to instead "Manage Preferences" concerning the placement and use of such cookies.

146. Consistent with his typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Ortiz selected and clicked the "Manage Preferences" link, which directed his to Defendant's Storage Preferences window. There, Plaintiff Ortiz viewed Defendant's representation that, "[y]ou have the option of disabling certain types of cookies[.]" Based on Defendant's further representations, Plaintiff Ortiz saw that he could disable all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those "Essential" for the Hoka Website to function), as well as opt out of the sale or sharing of his personal information, by adjusting the available toggle buttons or settings to do so.

147. Plaintiff Ortiz believed that adjusting the available toggle buttons or settings on the Storage Preferences window found on the Hoka Website would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics). Accordingly, Plaintiff Ortiz adjusted all available toggle buttons or settings to do so, and confirmed his choices by clicking or selecting the "Save" button.

148. In adjusting the available toggle buttons or settings on the Storage Preferences window, Plaintiff Ortiz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Hoka Website. Further, Plaintiff Ortiz specifically rejected, based on Defendant's representations, those cookies used to "deliver

advertising that is more relevant to [users] and [their] interests" and sell or share user information with third parties. In reliance on these representations and promises, only then did Plaintiff Oritz continue browsing the Hoka Website.

149. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for targeted advertising, personalization, and analytics, to be placed on Plaintiff Ortiz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Ortiz's knowledge. Accordingly, the popup cookie consent banner's and Storage Preference window's representations to Plaintiff Ortiz that he could disable or reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Hoka Website were false. Contrary to what Defendant made Plaintiff Ortiz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

150. Then, as Plaintiff Ortiz continued to browse the Hoka Website in reliance on the promises Defendant made in the cookie consent banner and Storage Preferences window, and despite Plaintiff Ortiz's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising, personalization, and analytics services from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Ortiz's Private Communications as Plaintiff Ortiz browsed the Hoka Website.

151. Defendant's representations that consumers could disable or reject all categories of cookies, except those cookies "Essential" for the Websites to function, as well as opt out of the sale and sharing of user personal information, while Plaintiff Ortiz and users browsed the Hoka Website, or at least those involved in providing personalized content, targeted advertising, and analytics services, were untrue. Had Plaintiff Ortiz known this fact, he would not have used the Hoka Website. Moreover, Plaintiff Ortiz reviewed the popup cookie consent banner and Storage Preferences window prior to using the Hoka Website. Had Defendant disclosed that it

would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable or reject all such cookies, Plaintiff Ortiz would have noticed it and would not have used the Hoka Website or, at a minimum, he would have interacted with the Hoka Website differently.

152. Plaintiff Ortiz continues to desire to browse content featured on the Hoka Website. Plaintiff Ortiz would like to browse websites that do not misrepresent that users can disable or reject all non-essential cookies and tracking technologies. If the Hoka Website were programmed to honor users' requests to disable or reject all such non-essential cookies and tracking technologies, Plaintiff Ortiz would likely browse the Hoka Website again in the future, but will not do so until then. Plaintiff Ortiz regularly visits websites that feature content similar to that of the Hoka Website. Because Plaintiff Ortiz does not know how the Hoka Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Hoka Website honors users' requests to reject all non-essential cookies and tracking technologies, Plaintiff Ortiz will be unable to rely on Defendant's representations when browsing the Hoka Website (or Defendant's other Websites) in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Ortiz is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Willis Albrigo**

153. Plaintiff Willis Albrigo visited the Sanuk Website, while located in California, on approximately a monthly basis over the past four years, including in September 2025 to search for yoga wedge flip flops that were difficult to find. When Plaintiff Albrigo visited the Sanuk Website and was presented with a cookies banner, it appeared in the same form or in a form substantially similar to the form alleged in this Complaint.

154. Plaintiff Willis Albrigo visited the Ugg Website, while located in California, approximately every other month for the past four years, including in or about Setember 2025. When Plaintiff Albrigo visited the Ugg Website and was presented with a cookies banner, it appeared in the same form or in a form substantially similar to the form alleged in this Complaint.

155. Plaintiff Willis Albrigo visited the Koolaburra Website, while located in California, on one or more occasions during the last four years. When Plaintiff Albrigo visited the Koolaburra Website and was presented with a cookies banner, it appeared in the same form or in a form substantially similar to the form alleged in this Complaint.

156. Plaintiff Willis Albrigo's visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Willis Albrigo is not a consumer advocate, a "tester," or a compliance auditor that visited the Websites to test or evaluate Defendant's privacy practices.

157. Specifically, Plaintiff Willis Albrigo searched the Websites for boots that she might want to purchase to wear walking her dog.

158. When Plaintiff Willis Albrigo visited the Websites, the Websites immediately detected that she was a visitor in California and presented her with Defendant's popup cookie consent banner, which provided the option to select the "Manage Preferences" link. Plaintiff Willis Albrigo viewed Defendant's representation on the popup cookie consent banner that, "This website utilizes technologies such as cookies to enable essential site functionality, as well as for analytics, personalization, and targeted advertising purposes." Plaintiff Willis Albrigo also viewed Defendant's additional representation that users could, rather than choosing to accept all such cookies, to instead "Manage Preferences" concerning the placement and use of such cookies.

159. Consistent with her typical practice in rejecting or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff Willis Albrigo selected and clicked the "Manage Preferences" link, which directed her to Defendant's Storage Preferences window. There, Plaintiff Willis Albrigo viewed Defendant's representation that, "[y]ou have the option of disabling certain types of cookies[.]" Based on Defendant's further representations,

Plaintiff Willis Albrigo saw that she could disable all cookies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those "Essential" for the Websites to function), as well as opt out of the sale or sharing of her personal information, by adjusting the available toggle buttons or settings to do so.

160. Plaintiff Willis Albrigo believed that adjusting the available toggle buttons or settings on the Storage Preferences window found on the Websites would allow her to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics). Accordingly, Plaintiff Willis Albrigo declined cookies and/or adjusted all available toggle buttons or settings to do so, and confirmed her choices by clicking or selecting the "Save" button.

161. In declining cookies and/or adjusting the available toggle buttons or settings on the Storage Preferences window, Plaintiff Willis Albrigo gave Defendant notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Willis Albrigo specifically rejected, based on Defendant's representations, those cookies used to "deliver advertising that is more relevant to [users] and [their] interests" and sell or share user information with third parties. In reliance on these representations and promises, only then did Plaintiff Willis Albrigo continue browsing the Websites.

162. Even before the popup cookie consent banner appeared on the screen and after Plaintiff declined cookies, Defendant nonetheless caused cookies and tracking technologies, including those used for targeted advertising, personalization, and analytics, to be placed on Plaintiff Willis Albrigo's device and/or transmitted to the Third Parties along with user data, without Plaintiff Willis Albrigo's knowledge. Accordingly, the popup cookie consent banner's and Storage Preference window's representations to Plaintiff Willis Albrigo that she could disable or reject the use and/or placement of all non-essential cookies and tracking technologies while she browsed the Websites were false. Contrary to what Defendant made Plaintiff Willis

Albrigo believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant had already caused that to happen.

163. Then, as Plaintiff Willis Albrigo continued to browse the Websites in reliance on the promises Defendant made in the cookie consent banner and Storage Preferences window, and despite Plaintiff Willis Albrigo's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing targeted advertising, personalization, and analytics services from the Third Parties on her device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Willis Albrigo's Private Communications as Plaintiff Willis Albrigo browsed the Websites.

164. Defendant's representations that consumers could disable or reject all categories of cookies, except those cookies "Essential" for the Websites to function, as well as opt out of the sale and sharing of user personal information, while Plaintiff Willis Albrigo and users browsed the Websites, or at least those involved in providing personalized content, targeted advertising, and analytics services, were untrue. Had Plaintiff Willis Albrigo known this fact, she would not have used the Websites. Moreover, Plaintiff Willis Albrigo reviewed the popup cookie consent banner and Storage Preferences window prior to using the Websites. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable or reject all such cookies, Plaintiff Willis Albrigo would have noticed it and would not have used the Websites or, at a minimum, she would have interacted with the Websites differently.

165. Plaintiff Willis Albrigo continues to desire to browse content featured on the Websites. Plaintiff Willis Albrigo would like to browse websites that do not misrepresent that users can disable or reject all non-essential cookies and tracking technologies. If the Websites were programmed to honor users' requests to disable or reject all such non-essential cookies and tracking technologies, Plaintiff Willis Albrigo would likely browse the Websites again in the future, but will not do so until then. Plaintiff Willis Albrigo regularly visits websites that feature

content similar to that of the Websites. Because Plaintiff Willis Albrigo does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff Willis Albrigo will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Willis Albrigo is not a software developer and has not received training with respect to HTTP network calls

## CLASS ALLEGATIONS

166. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of Defendant's Websites in the State of California after adjusting the toggle buttons or settings in the Storage Preferences window to disable or reject cookies and other tracking technologies.

167. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

168. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

169. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful

conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to disable or reject all non-essential cookies and tracking technologies on the Websites, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

170. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

171. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Websites, disabled or rejected non-essential cookies, and had their confidential Private Communications intercepted by the Third Parties.

172. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

173. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

174. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

175. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

176. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

177. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could disable or reject all cookies

and related tracking technologies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information, before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner and Storage Preferences window on the Websites, Plaintiffs and Class members disabled and rejected non-essential cookies and reasonably expected that their choice to disable or reject non-essential cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they disabled or rejected all such non-essential cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

178. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

179. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed

information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

180. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

181. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

182. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

183. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

184. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

185. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and

Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to disable or reject the Websites' use of non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Second Cause of Action</u>: Intrusion Upon Seclusion**

186. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

187. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

188. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of its Websites' users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

189. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Websites' users specifically chose to disable or reject all cookies and related tracking technologies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information.

190. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendant's

promise that users could disable or reject all non-essential cookies, as well as state criminal and civil laws designed to protect individual privacy.

191. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that its Websites' users could disable or reject all cookies and related tracking technologies, including Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information, when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers disabled or rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they disabled or rejected all non-essential cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

192. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

193. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

194. Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

195. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and

Plaintiffs' and Class members' choice to disable or reject the Websites' use of non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Third Cause of Action</u>: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

196. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

197. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

198. Defendant is a "person" within the meaning of California Penal Code § 631.

199. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

200. Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

201. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

202. At all relevant times, the Websites caused Plaintiffs' and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

203. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

204. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Websites' users' affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

205. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

206. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of

Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to disable or reject all non-essential cookies using the toggle buttons or settings available in the Websites' Storage Preferences window.

207. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

208. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

209. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

210. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with

Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to footwear products. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to disable or reject non-essential cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

211. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

212. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

213. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

214. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

215. The Third Parties' cookies and the corresponding software code installed by Defendant on its Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

216. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code establish and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be transmitted to the Third Parties.

217. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites.

218. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Websites' use of third-party cookies by adjusting the available toggle buttons or settings to reject all non-essential cookies in the Storage Preferences window.

219. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

220. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

221. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**<u>Fifth Cause of Action</u>: Common Law Fraud, Deceit and/or Misrepresentation**

222. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

223. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could disable or reject all cookies and related tracking technologies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information.

224. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted the available toggle buttons or settings in the Storage Preferences window to disable or reject all non-essential cookies and tracking technologies. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to disable or reject all non-essential cookies and related tracking technologies.

225. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

226. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

227. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to disable and/or reject non-essential cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

228. Industry documentation for the consent management platforms and Third Parties' technologies used on the Websites explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Websites. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Websites. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and transmitted to the Third Parties notwithstanding Defendant's contrary representations.

229. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be transmitted to and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

230. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See*, *e.g*., California Consumer Privacy Rights Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id*. § 7101 (business record keeping requirements regarding opt out requests).

231. On information and belief, Defendant either knew its representations regarding users' ability to reject cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were, or made those representations carelessly and recklessly

despite information available to Defendant demonstrating that users' data continued to be collected and transmitted to the Third Parties after users attempted to opt out.

232. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

233. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

234. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

235. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

236. Defendant's representation that consumers could disable or reject all non-essential cookies (including those used to "deliver advertising that is more relevant to [users] and [users'] interests" and "sell [users'] personal information or share [users'] personal information for online targeted advertising activities") if they adjusted the available toggle buttons or settings in the Storage Preference window was untrue. Again, had Plaintiffs and Class

members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Websites. Had Defendant disclosed that it caused third-party non-essential cookies to be stored on the Websites' visitors' devices that are related to personalization, advertising, and analytics, and/or share information with third parties even after they choose to disable or reject all such non-essential cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

237. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to disable or reject all non-essential cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

238. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

239. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

240. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to disable or reject the Websites' use of non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment**

241. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

242. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

243. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could disable or reject all cookies and related tracking technologies, including all categories of Targeted Advertising, Personalization, and Analytics cookies (except those cookies "Essential" for the Websites to function), as well as opt out of the sale and sharing of user personal information, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members disable or reject all such non-essential cookies.

244. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

245. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

246. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

247. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

248. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

249. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

250. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

**PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: May 26, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

Patrick J. Branson, *pro hac vice*
patrick@gutridesafier.com
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*